May it please the Court, Daniel Maynard on behalf of the appellant Robert Towery. Your Honors, in March of 1992, Mr. Towery was in trial starting in the middle of March on an armed robbery charge. There were four armed robberies. There were eight witnesses in that case. There were the four victims, there were three police officers, and there was Mr. Towery's roommate, Mr. Meacham, who testified in that case. The case was decided towards the end of March. The jury came back against Mr. Towery. In that case, Mr. Meacham testified that he had overheard Mr. Towery speaking with their third roommate, Mr. Barker. And Mr. Meacham testified that Mr. Towery made an inculpatory statement that was to the effect, I tried to get this old man to do what I wanted him to do, but he wouldn't do it. That was consistent with the evidence that had been put on by the victims in the case, because one of the victims in the case was a 58-year-old gentleman who had attempted to hide his wallet and had not been following Mr. Towery. Some of us, that's not so old. That's true. Mr. Towery was 28. Mr. Barker was 28 at the time. And Mr. Meacham, I believe, was 32 or 33. So to them, it seemed like an older gentleman. The testimony was consistent with what had occurred at that particular incident. And Mr. Towery is convicted. Now, there is no testimony from Mr. Meacham at that time about anybody being tied up. There's no testimony about knocking anyone down. That is the sum and substance of the testimony that Mr. Meacham gives. But you also need to understand that this isn't just a passing piece of testimony from Mr. Meacham. It takes three to four pages in the transcript. Mr. Meacham gives this testimony twice. He starts by giving it, and then there are objections from defense counsel concerning the foundation. Give us some timing, who's present, what's the place. And so all that foundation is laid in front of the judge by the prosecutor. And then again, he gives that testimony. Now, we're talking still in the first trial. We're still in the first trial. The judge sentences Mr. Towery to four life sentences after that trial. Now, starting in August of 1992, and he is sentenced in the robbery case on May 1st of 1992. So approximately three months later, he starts another trial. This time we have a different defense attorney, but we have the same prosecutor and we have the same trial judge. The defense attorney in May 18th, less than three weeks after Mr. Towery had been sentenced in the armed robbery case or case number one, had asked for copies of the transcripts from that case, alleging in his motion that there were witnesses that had been noticed by the state in the armed robbery case that were going to be used in the murder case. The judge, without oral argument, denies the motion and states that the motion states that the state has given notice that it intends to call in its case in chief the victim from the robbery case, and court is not able to find any such notice. Well, that wasn't what was in the motion. The motion said there are witnesses from the armed robbery case that will be called. So the judge denies the motion. Admittedly, the judge does say that this is done without prejudice and you can raise it another time, and it's not done. The case goes to trial in April. Mr. Meacham gets on the stand again and in essence gives what appears to be the same, or a statement involving the same event that he allegedly overheard Mr. Towery and Mr. Barker have, the same conversation. And the Arizona Supreme Court found that it was clear that this one statement, and it's used by the prosecutor for two separate events. But what's important is to focus on the testimony that's given in the second trial. And what Mr. Meacham says this time is that Chewy, which was the nickname for Mr. Towery, having a hard time with an old man, so he had a hard time tying him up, and so he had to knock him down. Tying him up, knocking him down was never mentioned in the first case. Now, the Supreme Court, state Supreme Court, found that this was inappropriate conduct on the part of the prosecutor to have elicited the same comments and used it in two separate trials, and in particular when that prosecutor doesn't put anyone on notice. Now, and again, I want to emphasize that you have to go back. This isn't a passing comment. This is a significant witness. It's one of eight from the first case. He's given the same testimony in front of the same judge three months later. It can't be that it applies in both cases. But the defense attorney in this case did not have a copy of the transcript, so he had not seen or heard what Mr. Meacham was going to testify to. The judge knew because the judge had handled the objections, and they had been numerous in the first case concerning foundation. It may be that the judge didn't know that the prosecutor was going to elicit the same testimony from this individual, but having sat through a case where he had just sentenced somebody to four life sentences three months earlier, it's hard to understand that she wouldn't have understood the importance of that particular testimony three months later in an unrelated event. The prosecutor uses this testimony in his closing argument. And in his closing argument, he states that Mr. Meacham – and he misstates what Mr. Meacham has testified to. Mr. Meacham had testified that Mr. Towery had said he had to knock him down. In his closing argument, the prosecutor says that Mr. Meacham said he had to put him down and made reference to what one does with a dog, and that this clearly was indicating that Mr. Towery had had to kill Mr. Jones, who was the victim in the second case. Now, the Arizona Supreme Court and everybody who's looked at this case finds that this conduct by the prosecutor is inappropriate. But the question is, did it deny Mr. Towery his constitutional rights to due process, and did it result in a conviction that is unfair and unsafe, that this court should overturn? And we contend that it did. The prosecutor in the case has taken the position that as the case went on, and he prepared for the second one three months later, that it became clear to him that that testimony should have been in the second case and not in the first. If that were the case, he should have at least told the court, told defense counsel, I'm going to use some testimony that was inconsistent. Under Brady, you have to disclose exculpatory information. This is clearly exculpatory. If he's used it in one case and he's now going to use it for another proposition in a different case, he needed to disclose it so that the defense counsel could have used it for cross-examination. What would he ñ I'm having a little trouble since even with the disadvantages of being a new defense counsel without having been at first and not having the transcript, defense counsel got Meacham to say that, A, he thought the conversation related to the robbery incidents. He doesn't ñ he didn't think they were talking about the victim in the murder case, Jones, and ultimately he doesn't know who they were talking about. So all that came in, essentially, of a probative nature, was that Towery may have had a conversation that Meacham overheard, saying that he had to struggle with some older person, old man. So Meacham hasn't said anything inconsistent in that. I mean, he hasn't suddenly said, I testified in the first case that it was the robbery victim, and then he comes along in this case and has changed his testimony, saying, I heard this conversation, I have a perfect recall that it was now the murder victim. He didn't say that. He says quite the opposite. So the court ultimately, the Arizona Supreme Court, ultimately decided that, yes, there was misconduct, but it was misconduct, if anything, against the first proceeding, because now, according to the prosecutor's own theory, he was now persuaded that it was not referring to the gentleman in the robbery situation. He had a professional obligation to go in and let the judge and the appellate court know that there was a mistake there. What's the adverse impact, harmful impact in your case? Well, first off, the Arizona Supreme Court has made an unreasonable determination of the facts based upon the testimony that came out. Explain that. The prosecutor has taken the position and has constantly argued that as I prepared more for this, I believe that that testimony applies to the second case. Now, either one of a couple of things had to happen. The testimony in the first case was the fellow, the older fellow was uncooperative with me. That's it. And he specifically asked, is there any more? No. Is there anything else you can recall about that? No. Based on that, the prosecutor should not have ever thought that that applied to the second case. The victim in the second case, Mr. Jones, was always cooperative. There is no testimony that at any time was he ever uncooperative. Now, when Mr. – everybody wants to excuse Mr. Meacham's testimony. I'm sorry. I didn't follow that. Okay. So you're saying the prosecutor couldn't have believed that Meacham's testimony had anything to do with Jones because of the tying down and that that couldn't have applied to Jones? Yeah. It didn't apply to Jones because if you look at Meacham's testimony in the first case, he says the fellow was uncooperative. If you look at the conduct of the older fellow, one of the victims in the robbery case, he was uncooperative. He gets up. He testifies, I tried to hide my wallet. I wasn't listening to him. I tried to untie myself. And Towery or whoever was the robber at the time threatened me. So your thrust of your argument then is that the prosecutor knew that it had to apply only to the robbery and he was lying to the trial court in this murder case and everything he said about why he put him on in the murder case, that it couldn't have been in any sense applicable to Jones because Jones never put up a fight. And therefore he put on, yes, the defense counsel was able to say and impeach any suggestion that it did apply to Jones, but that he shouldn't have been up there in the first place because there was no foundation in the prosecutor's mind that it could ever have applied to Jones. That's right, unless the prosecutor had had subsequent conversations with Meacham and Meacham had told him something different than he had testified in the first case. The problem is there is nothing in the record. There was no disclosure ever made that there were any other subsequent interviews with Meacham. The prosecutor tells us, so let's assume that the prosecutor outright lied and put Meacham on the stand knowing full well that this testimony almost certainly, certainly whatever, didn't apply to Jones. The Arizona court still concluded that given the fact that Meacham's testimony was essentially rendered non-probative, it didn't say, in fact, he thought it was Jones and he doesn't know who they were talking about, then why is it unreasonable for them to conclude that it was harmless error? Because this was such a close case, Your Honor. The Arizona Supreme Court, at the very beginning of its opinion, talks about that this case is primarily based upon Barker's testimony, who is supposedly the co-defendant in this case. When you look at it, Towery has always professed his innocence as to this particular incident. He got up and he testified about what happened. He had an alibi witness who testified what happened. Barker gets up and testifies and gave at least three different stories and basically agreed that he was a pathological liar or a professional liar. What makes this case important or what makes Meacham's testimony important is it's the evidence that sort of sways it to the side of Barker. There's little or no physical evidence that connects Towery to this murder. Well, that's not exactly true. There were stolen items in his room. There was a gold crown that was in his suitcase. The security guard identified him as one of the people dropping off Joan's car. His girlfriend said that he said he deserved it, the guy's a pervert. Then he and Barker divided the stolen money evenly between them. Barker was in a state of shock after the incident, verifying that he couldn't believe what Towery had done. Now, that doesn't say that there's no evidence to suggest he was involved. There was little physical evidence. The explanation, I can go through each one. I mean, my worry is this, and I appreciate my colleagues' questions because I have Ed per review here. And with Ed per review, I not only have that, but now I'm looking at substantial evidence to sustain the verdict. And so that's why I listed out this list of evidence because I'm really saying now, what can I say as a circuit court, having had the highest court in Arizona suggest looking at this same stuff, that it's inconsistent with Supreme Court precedent or an unreasonable application thereof. That's the tough question, even if I would like to buy your argument because you seem to be a great advocate. But even if I've got to reach that standard. You do, and I understand the standard. I'm not asking you to change the standard, but I'm telling you that under the facts of this case, you do reach that standard. The Arizona Supreme Court comes to a conclusion that the prosecutor does something wrong, but somehow or another, this doesn't affect the case. Your Honor, if you looked at the first comment in the first case, and I don't want to keep beating this dog, and there's just no way he should have thought it applied to the second case. If he had put Meacham on the stand and Meacham had testified exactly the ways, it would have been inconsistent with what Barker was testifying to. Additionally, if Barker... But all of that, nonetheless, comes to the same point that my colleague is making. Even if we give you credit for all of that, I still have another court who is saying, even under general prosecutorial theory, does it so infect the trial with unfairness to make it a denial that it doesn't do it? And we all know, having done this a long time, that this is not mathematical certainty, but this is a case where you don't want to send a person to death based upon this type of conduct. I appreciate exactly what you're saying, but I also appreciate that I think the Supreme Court, and not only that, but Congress is saying, Ninth Circuit, and it may have been just right at us, Ninth Circuit, don't be changing these things and make it an AEDPA standard of review. If the highest Arizona Supreme Court has done everything that would consistently go with what the U.S. Supreme Court has said, you keep out of it. That was Congress telling, and it was probably to my court. I'm not going to argue that one. But the Arizona Supreme Court didn't deal with due process. It didn't deal with Brady. It didn't deal with NAPU. It basically said, although we find this to be inappropriate conduct, we decide that there is no denial of due process. Your Honor, for a prosecutor, and I believe it is clear that this prosecutor knew that he was not supposed to be using this testimony in this case. If he did know, if he did think he had made a mistake, why wouldn't he have gone up to the court and to the defense counsel and said, you know, I think I made a mistake under Brady. I have to give you notice of the mistake that I've made. If he knew that the testimony was going to be different, and it is different in the murder case versus the armed robbery case, somehow or another, if he knew, he had an obligation to tell. If you're really going to make this Brady argument, why is it the first time I really see it as in your reply brief? It was actually made in front of the district court, Your Honor. It's in the habeas, the failure to disclose. She specifically deals with Brady and talks about it in that case. Can I ask you to turn your attention to one of the issues that was not certified? But on the issue that we did invite supplemental briefing on, and that's on the question of procedural default versus merits decision on a judicial bias. You've sort of hinted at it a little bit on the bias aspect. But what is it we're reviewing if we were to grant the certificate of appealability on that issue? What decision are we reviewing? There are three different steps in the process. Do we defer to the third judge who ultimately finds that it was procedurally defaulted, or do we reach the merits? No, I think you reach the merits. When you look at the, I'm not sure how to pronounce it, Yiltz case, what the Supreme Court basically held was if the last court that decides this case waives or ignores the procedural default, then you can look at the substantive. Are you sure that's what that said, or is that a fact-specific case? Because when I read Harris v. Reed, it says, a state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state court holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. I understand that. But what we have here, and maybe it was shame on me for filing a motion for reconsideration, because if I hadn't filed a motion for reconsideration, I would have had two decisions that came in from the state courts that had not raised procedural default. The only time it is raised is when a new judge comes in and we had, on the Rule 32, I had moved to disqualify Judge Hendricks. I lost that. I then had the Rule 32 in front of Judge Hendricks. Both the judge who handled the motion for disqualification and Judge Hendricks dealt with the substance of the issue. If I had left it alone and not asked for reconsideration, no one would have ever raised procedural default in this case. It was a judge who heard the motion for reconsideration on the Rule 32, and he deals with the merits, but then he also says, by the way, this was never raised in front of the state supreme court. I believe that when the state has had at least three, if not four, opportunities, and I believe the state supreme court had the opportunity to review this also, that this court can find that there was no procedural default. I see that I have six. Can I go back for a moment to the Brady claim? Because I was a little troubled by this, but the district court dealt with it, as you say. Yes. And the district court said that the defense knew that Mecham would be a witness, and the petitioner was aware of Mecham's testimony, and that under counsel's questioning, Mecham testified that he believed the conversation referred to the earlier crime. So counsel couldn't have achieved anything more, even if he had been aware of the state's prior inconsistent use of the testimony. You don't take that on in your opening brief, and you don't really come back to it until the reply. So I'm just wondering, were to assume that the district court appropriately handled that? No, she didn't. So it's probably my fault for not having taken it on immediately in the opening brief. But the point, Your Honor, is, yes, there is cross-examination by the defense counsel, and he gets at some point Mr. Mecham to say. And the defense counsel did know that he testified in the prior. Yes. Yes, he did. And that was the reason he had asked for the transcripts to begin with. He never said that a victim was coming on to testify, other witnesses. The three witnesses that had been listed by the government from the robbery case were two police officers and Mr. Mecham. Now, he didn't know what Mr. Mecham was going to say, nor did he have the transcript, which he should have gotten, which would show that Mr. Mecham's testimony was inaccurate or had now been enhanced for some reason. He's talking about things now that he never testified about four months earlier. And when he had testified in the armed robbery case, he had specifically asked a couple of times, is there anything else you can recall? How is it that now, four or five months later, unless there had been some prepping by the government, he all of a sudden adds some new factors that seem to now apply to the murder case that wouldn't have applied to the armed robbery? Okay. I'd like to reserve my four minutes, three and a half. Excuse me a minute. Please, the Court. My name is John Anderson, representing Appalachian Respondents, State of Arizona, and now Director Ryan rather than Director Schreerow. I'd like to pick up on Judge Smith's point that this is an AEDPA case. And under AEDPA, the question is whether the State court unreasonably implied clearly established Federal law. The first question is, which clearly established Federal law was the Arizona Supreme Court required to apply? In the opening brief, appellants cited only Donnelly, so the Arizona Supreme Court, it was a judicial estoppel issue and just a general Donnelly issue. Brady was not raised at that point. Brady was not raised in the post-conviction proceedings. In that proceeding, the NAPHEW claim did come in. That was started to be raised then. And that's when Judge Henders specifically found that the testimony wasn't false and the prosecutor couldn't have known it was false. Then when it gets to Federal habeas, the Brady is kind of related to the NAPHEW claim. So the district court, in its order, did point out that the defense did have reason to know of it. But the district court didn't cite the most compelling evidence that the defense actually knew of it. The transcript during the Rule 32 hearings of an evidentiary hearing, it's, I believe, 10-22-96. It's where it's actually testified. And at that proceeding, he testified, the defense attorneys leading him saying, you did not advise defense counsel about this different use of the evidence. And he said, that's incorrect. The prosecutor said, that's incorrect. This is at page 17 of my partial transcript. I think it's in page 18 of the partial excerpt that the felon has cited. That's where it is. You did advise defense counsel? You're darn right I did. When was that? We were talking about the circumstances. This is while they were interviewing Barker for the second trial. During the Barker interview, this is at page 18 of my partial transcript. I think it's page 19 of the full transcript. It became apparent that I had screwed up, that the comment that was listed did not apply to that barroom incident. It occurred after the murder of Mark Jones. As the prosecutor told the court, this was an unusual Arizona Supreme Court argument. The Arizona Supreme Court ordered the prosecutor to attend the oral argument. Usually, it's just the attorney general's office presents the case. So he actually kind of testified to the court. And the Arizona Supreme Court assumed that he was in good faith in realizing that it applied to the second incident. And a couple of points. One, the Jones was older, 68 versus 55. There were four victims in the other case, the oldest of which was 55. And the statement was made after Mecham came home and all this property was in his house. So both the timing and the age of the defendant certainly support the inference that it referred to the second statement. So it was disclosed. So that's why there's no Brady claim here. Well, we'd argue first that it's procedurally defaulted because it wasn't presented to the state courts. It wasn't presented until the reply brief. But if this Court wants to reach it, it clearly was disclosed. Now, the Arizona Supreme Court, under whatever rubric you want to call it, Donnelly, McHugh, or Brady, it found that it wasn't – it was harmless beyond a reasonable doubt. The Arizona Supreme Court applied that standard. Now, in Hague's review, this Court applies the Brecht standard, which is more deferential. But there's a clear finding from the Arizona – ruling from the Arizona Supreme Court that it was harmless beyond a reasonable doubt. And this Court's discussed a lot of that evidence. Mecham was a very short witness. He only testified to basically three things. He testified that when he came home, there was a bunch of property in the house, that the people were partying and doing drugs. And – and Towery didn't deny that. He says that Parker got all the stuff. But he doesn't deny that all the property was there. The only thing that he denies was the – the statement about the old man. But that was a very minor part of his testimony. Mecham was a minor witness. It's like 20 or 30 pages of transcript. As the Arizona Supreme Court found, this was primarily based on the testimony of Barker, co-defendant Barker. But it was also – and Judge Smith went through a lot of that evidence – in that briefcase found in his room. Monique Rousseau's testimony about the – Towery saying that – It is true that there was very – there was little physical evidence of seeing the crime. That's correct, Your Honor. And the evidence was that they wore gloves. And so there were no fingerprints. Now, there was a fingerprint – Towery's fingerprint was found on the tape deck that was taken out of the Lincoln that was stolen from the defendant. But the prosecutor seemed to give it, you know, about the same amount of time he gave to Monique Rousseau. In his closing argument, he probably heard the phrase, dim bulb before, and it fits John Mecham. Is he capable of lying? And then he talks about the conversation and uses that as part of the package of evidence, circumstantial evidence against him. That's correct, Your Honor. Is it important? I wouldn't say it's not important, but it's certainly an insignificant, minor part of the evidence compared to the extensive testimony of Barker. And my point in citing Rousseau is – Yeah, but, I mean, Barker's – that's the whole question, Barker's credibility. I mean, all of this falls down. If Barker's lying, then the question is, you know, he's made this up. Then, yeah. I mean, but if – well, sure, sure. That's all trying to bolster the fact that Barker is being – is telling the truth. Sure. And the Arizona Supreme Court said the case primarily rested on Barker. And obviously, the jury – the defendant testified. He presented his alibi witness. And obviously, as the Arizona Supreme Court specifically found, the jury believed Barker over Cowley. And I'm just pointing out all this other physical evidence which corroborates Barker's story. If there's no more questions on that point, I will briefly proceed to the second issue, the procedural default issue. And I think the standard is, under Ilst, it's the last reason state court decision. And the last reason state court decision was Judge Keppel's decision, denying a motion for a hearing. He made the alternative finding. He said it's procedural default. And he specifically cited A-3, which is not raising it previously. This Court's upheld the A-3 procedural default on several occasions. And in the reply brief, the appellant argues that it was properly presented to higher courts or other courts because of the fundamental error review. Well, this Court specifically held that the fundamental error review in Arizona doesn't exhaust any issues, even on direct appeal. And this is on collateral review. And a couple of cases, I'll just make those cites. Castillo v. McFadden, 399, F3rd, 993, 2004. Beatty v. Stewart, 303, F3rd, 975, 2001. There's a couple more polling cases. Martinez, Villarreal, but I won't give those full cites. And those apply to direct appeal. The law of Arizona is that under State v. McFord, 125 Arizona, 377, 1980, there isn't any fundamental error review in the collateral process. So in no way did any further proceedings undo the last reason decision of procedural default. We believe the judicial misconduct claim is clearly meritless. It's based on on-the-court rulings, but we would urge, of course, the Court to rule that it's procedurally faulted. That's all I have. If the Court has any further questions on this or any other issues, I'd be happy to respond. Thank you. Your Honors, when you go back and you look at the Arizona Supreme Court case, the decision in this case, they specifically state that the State's case is based on Barker's testimony. And the question becomes is how do you bolster that, whether Barker is credible? And they did it through Meacham. To say that Meacham's testimony isn't important, the prosecutor used it both in his opening and he used it in his closing. And he emphasized it in his closing. And when the defense attorney attempted to impeach Meacham, Your Honors, Judge Smith, as you said, Smith or Smith. Wasn't there. I know. I'm trying to remember all of that stuff about people who sin. All right. I'm guilty of that too. There you go. But in the case of Meacham, Meacham's testimony clearly bolstered Barker's. And it did it in a degree that if you had looked at what Meacham had testified in the armed robbery case, it would not have. But it does here. Somehow or another, it does. Now, counsel has said that Mr. Ditsworth, the prosecutor, gave information to the defense counsel. He did testify to that in the Rule 32. But it's not believable. He was called by the Arizona Supreme Court to come in and be there to answer questions. When you look at the Supreme Court's decision on page 15 of the decision, it says, Moreover, before putting Meacham on the stand in the murder trial, the prosecutor failed to notify the court or defense counsel that he would present evidence of the same admission Meacham described in the robbery trial. Don't you think if a prosecutor was called by the state Supreme Court dealing with his unethical conduct and is there to answer questions from those five justices, he would have said to them, Oh, I told the defense attorney. He didn't do it. The court made a specific finding after questioning him while he was in front of him. I suggest to the court that Mr. Meacham's testimony or Mr. Ditsworth's testimony in the Rule 32 was self-serving, in contrary to what happened in front of the state Supreme Court. Again, I understand. He did know that there had been prior testimony. The defense counsel did know that there had been prior testimony. Absolutely. And ask for the transcript. And I guess shame on him for not going back and saying specifically. But he said a witness. I mean, there were only three that were overlapping, the two police officers and Mr. Meacham. Why the court didn't give that, I don't know. But, Your Honor, the cross-examination, yes, Mr. Meacham is cross-examined on it. But Mr. Ditsworth comes back on redirect examination and says, Jeez, you don't really know who you're talking to. In fact, it could have been about Mr. Jones, isn't it? And so he basically gets him to retract what he said on cross-examination. And then he utilizes that and changes the words and makes it misleading and says, This shows that he put him down like he did to a dog. This conviction is not safe. This court should overturn this conviction and nobody should die based upon the facts in this case. Thank you, counsel. Thank you. The matter just argued is submitted for decision. The court thanks counsel for the argument presented. That concludes the court's calendar for this morning, and the court stands adjourned.
judges: Schroeder, Fisher, Smith N. R.